IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA
EASTERN DIVISION

| | |
|---|---|
| Ellingson Drainage, Inc.,<br><br>　　　　　　　　　Plaintiff,<br><br>　vs.<br><br>John Kippen and Landmark Drainage, LLC,<br><br>　　　　　　　　　Defendants. | **ORDER DENYING MOTION FOR PRELIMINARY INJUNCTION**<br><br>Case No. 3:22-cv-189 |

Plaintiff Ellingson Drainage, Inc. ("Ellingson") moves for a preliminary injunction. Doc. No. 18. Ellingson seeks to enjoin Defendants John Kippen ("Kippen") and Landmark Drainage, LLC, ("Landmark") (together, the "Defendants") from:

> (a) misappropriating trade secrets and other protected information from Ellingson; (b) from using or otherwise disclosing further any documents, materials, or information taken from Ellingson; and (c) contacting or working with customers whose information or documents were wrongfully taken from Ellingson.

Id. Landmark opposes the motion (Doc. No. 21), as does Kippen. Doc. No. 24. A hearing was held on the motion on June 30, 2023. Doc. No. 25. For the reasons below, the motion is denied.

**I.　BACKGROUND**

Ellingson and Landmark are both in the business of drain tile. Drain tiles are typically installed on real property to move subsurface water from one spot to another. Doc. No. 22 ¶ 10. Ellingson and Landmark had a prior business relationship but are now competitors, and Kippen, who used to be employed by Ellingson, is now employed by Landmark. This dispute (and this motion) centers on whether Landmark and Kippen misappropriated Ellingson's trade secrets.

In 2012, Ellingson and Landmark started working together and negotiated a subcontract agreement—the Drain Tile Installation Agreement (the "Agreement"). Per that Agreement, Landmark would complete some drain tile work in the Red River Valley.

1

Doc. No. 20 ¶¶ 9-10; Doc. No. 22 ¶ 11; Doc. No. 22-1. The Agreement contains a "Confidential Information and Non-Disclosure Covenant" provision. Id. p. 3. The Agreement is governed by Minnesota law. Id.

In 2015, Ellingson and Landmark executed a new subcontract agreement—the Master Subcontract Agreement (the "Master Agreement"). Doc. No. 22 ¶ 14. The Master Agreement superseded all prior agreements and did not contain any provisions regarding confidentiality or nondisclosure. Doc. No. 22-2. It is also governed by Minnesota law. Doc. No. 22-2.

According to Ellingson, the agreements resulted in a "nearly decade-long partnership" between Ellingson and Landmark. Doc. No. 20 ¶ 12. During this time, "[t]he only documents Ellingson provided to Landmark were estimates, invoices, maps, plans, and cut sheets for each particular project," according to Landmark. Doc. No. 22 ¶ 11. Landmark asserts the estimates, invoices, maps, plans, and cut sheets were never disclosed as confidential or secret, and the customer received the same documentation. Id. ¶¶ 11, 12. According to Landmark, it "never had any access to purported customer lists or how Ellingson came up with its lump sum quotes."[1] Id. ¶ 12. Additionally, for all non-Ellingson drain tiling projects during the subcontractor relationship, Landmark had its own mapping services, prepared its own plans and cut sheets, and performed its own surveying. Id. ¶ 7. Eventually, the business relationship deteriorated, and Landmark terminated its partnership with Ellingson in December of 2021. Doc. No. 20 ¶ 13; Doc. No. 22 ¶ 15.

Turning to Kippen, in 2018, Kippen approached Ellingson about selling his drain tile operation, which Ellingson purchased. Doc. No. 20 ¶¶ 18, 20. As part of the terms of the purchase agreement, Kippen agreed to be a sales consultant for Ellingson's drain tile sales division, as he had a background in agriculture and "was effective at selling drain tile." Id. ¶¶ 17, 20. As a sales

---

[1] Landmark asserts that it has never performed work for any customers for which it installed drain tile as a subcontractor to Ellingson, to the best of its knowledge. Doc. No. 22 ¶ 16.

consultant,[2] and according to Ellingson, Kippen was exposed to its "drain tile trade secrets," including "customer lists, pricing and other bid practices, margins, profit information, job costs, material suppliers, mapping and bidding techniques, drain tile plan techniques, installation techniques, and other processes and enhancements to the materials [Ellingson] use[s] to tile agricultural fields." Doc. No. 20 ¶ 21. Kippen did sign a nondisclosure agreement.[3] Doc. No. 25-3. The nondisclosure agreement states that "'Confidential Information' means information or material that is commercially valuable to [Ellingson] and is not generally known or readily ascertainable in the industry." Id. p. 2. It lists some examples of confidential information, which includes customers lists and customer information. Id. p. 2. Such information, however, is not confidential if it was known to Kippen before such information was disclosed by Ellingson, was public knowledge, or "becomes lawfully available to [Kippen] from a source other than [Ellingson]." Id. The obligation continues after Kippen's employment with Ellingson ends and "continues for so long as such Confidential Information remains a trade secret." Id. At some point, the relationship between Ellingson and Kippen declined, and they "eventually parted ways." Doc. No. 20 ¶ 25. Shortly before leaving his employment, however, Kippen allegedly downloaded approximately 800 files, according to Ellingson. Id.

After leaving Ellingson, Kippen approached Landmark, and in June of 2022, Landmark hired him as an independent sales representative selling drain tiles. Id. ¶ 26; Doc. No. 22 ¶¶ 17-18. Landmark asserts that Kippen "stated he had longtime contacts in the area, contacts that preexisted his relationship with Ellingson, that could become potential customers for Landmark." Id. ¶ 17. As relevant to this case, Landmark specifically identifies six customers from whom Kippen obtained Ellingson proposals, plans, or cutsheets: Evergreen Farms, Osowski Farms, Joel Slominski, T & G

---

[2] Kippen alleges, and Ellingson does not dispute (at least at this stage of the proceedings), he worked for Ellingson as an independent contractor. Doc. No. 24.
[3] Given the timeline, the date of the nondisclosure agreement, which was signed in 2013, is quite confusing, at best.

3

Farms, Scott Demers, Mahar Farms.[4] Id. ¶ 22. Kippen emailed the proposals, maps, or cutsheets to Landmark, except for documents obtained from Mahar Farms. Id. ¶ 22. The Ellingson plans Landmark obtained are not stamped "confidential" or "secret." Id. ¶¶ 34-38. Landmark asserts these are the only projects Kippen acquired for Landmark involving Ellingson documents. Id. ¶ 33. And importantly, Landmark prepared its own maps, cut sheets, and plans for each of these clients with different software. Id.

On November 1, 2022, Ellingson filed this lawsuit against Landmark and Kippen, claiming a violation of the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836, et. seq., and breach of contract. Doc. No. 1. Approximately six months later, Ellingson filed this motion for preliminary injunction. Doc. No. 18.

## II.    LAW AND ANALYSIS

Rule 65(a) of the Federal Rules of Civil Procedure authorizes district courts to grant preliminary injunctions. "A preliminary injunction is an extraordinary remedy never awarded as of right." Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 24 (2008). When considering a motion for preliminary injunction, courts weigh the four factors set forth in Dataphase Systems, Inc., v. C L Systems, Inc., 640 F.2d 109 (8th Cir. 1981) (en banc). The Dataphase factors include: "(1) the threat of irreparable harm to the movant; (2) the state of balance between this harm and the injury that granting the injunction will inflict on other parties litigant; (3) the probability that movant will succeed on the merits; and (4) the public interest." Id. at 114. Likelihood of success on the merits is the most important factor. Brady v. Nat'l Football League, 640 F.3d 785, 789 (8th Cir. 2011). The burden to demonstrate the necessity of a preliminary injunction rests with the movant. General Motors Corp. v. Harry Brown's, LLC, 563 F.3d 312, 316 (8th Cir. 2009).

---

[4] According to Landmark, it is common practice in the drain tile industry to supply quotes, maps, plans, and cut sheets to prospective customers, and they are free to seek out alternative bids from other contractors. Doc. No. 22 ¶ 21.

A.     **Likelihood of Success on the Merits**

In evaluating likelihood of success on the merits, courts "flexibly weigh the case's particular circumstances to determine 'whether the balance of equities so favors the movant that justice requires the court to intervene to preserve the status quo until the merits are determined.'" Calvin Klein Cosmetics Corp. v. Lenox Labs., Inc., 815 F.2d 500, 503 (8th Cir. 1987). At this early stage, whether the movant will ultimately prevail is immaterial. PCTV Gold, Inc. v. SpeedNet, LLC, 508 F.3d 1137, 1143 (8th Cir. 2007). Instead, the movant need only show a "fair chance of prevailing." Planned Parenthood Minn., N.D., S.D. v. Rounds, 530 F.3d 724, 732 (8th Cir. 2008) (en banc). "'The absence of a likelihood of success on the merits strongly suggests that preliminary injunctive relief should be denied.'" Prime Therapeutics LLC v. Beatty, 354 F. Supp. 3d 957, 967 (D. Minn. 2018) (quoting CDI Energy Servs. v. W. River Pumps, Inc., 567 F.3d 398, 402 (8th Cir. 2009)).

In its complaint, Ellingson alleges two claims, a DTSA violation and a breach of contract claim. For the purposes of the preliminary injunction, the bulk of the arguments focused on the alleged DTSA violation.[5] The DTSA governs civil misappropriation of trade secrets at the federal level. To establish liability, a plaintiff must show "(1) it is the 'owner' of a 'trade secret;' (2) the trade secret was 'misappropriated;' (3) the trade secret is related to a product or services used in, or intended for use in, interstate or foreign commerce; and (4) damages for actual loss caused by the misappropriation." KLX Energy Servs. LLC v. Telos Indus., Inc., No. 1:18-CV-00225, 2021 WL 9666530, at *3 (D.N.D. July 29, 2021) (citing 18 U.S.C. § 1836(b)(1) and (b)(3)(B)). Many of these terms of art are specifically defined terms in the statute. A trade secret is defined as:

> all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or

---

[5] Neither party fully analyzed nor briefed the likelihood of success on the merits of the breach of contract claim with any particularity. Given that limited record, the Court cannot conclude that Ellingson has demonstrated a likelihood of success on the merits of that claim.

memorialized physically, electronically, graphically, photographically, or in writing if--

(A) the owner thereof has taken reasonable measures to keep such information secret; and

(B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information;

18 U.S.C. § 1839(3). "Misappropriation" means:

(a) acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or

(b) disclosure or use of a trade secret of another without express or implied consent by a person who—

(1) used improper means to acquire knowledge of the trade secret;

(2) at the time of disclosure or use, knew or had reason to know that the knowledge of the trade secret was—

(a) derived from or through a person who had used improper means to acquire the trade secret;

(b) acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secret or limit the use of the trade secret; or

(c) derived from or through a person who owed a duty to the person seeking relief to maintain the secrecy of the trade secret or limit the use of the trade secret; or

(3) before a material change of the position of the person, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake.

18 U.S.C. § 1839(5). And "improper means":

(A) includes theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means; and

(B) does not include reverse engineering, independent derivation, or any other lawful means of acquisition;

18 U.S.C. § 1839(6).

Landmark challenges the first two elements, asserting Ellingson cannot show it owned a trade secret (and even if it did, it did not take reasonable measures to keep the information secret), and that Ellingson cannot show any misappropriation. As to the first element, Ellingson argues that its drain tile plans and customer lists qualify as trade secrets. Doc. No. 19, pp. 6-7. At the hearing, Derek Ellingson (an owner of Ellingson) responded that the trade secrets at issue were Ellingson's "processes and procedures" (which essentially parrots the language of the DTSA). Identifying what specific trade secrets are precisely at issue is difficult, but assuming without deciding that this information meets the first part of the trade secret definition, the question then becomes whether Ellingson took reasonable steps to keep the information secret.

The DTSA does not require "[a]bsolute secrecy" but only "reasonable steps to keep the information from those outside in the general trade or industry." Prairie Field Servs., LLC v. Welsh, 497 F. Supp. 3d 381, 395-96 (D. Minn. 2020) (cleaned up). "The use of proprietary legends on documents or the existence of confidentiality agreements are frequently-considered factors in establishing or denying a trade secret claim." AvidAir Helicopter Supply, Inc. v. Rolls-Royce Corp., 663 F.3d 966, 974 (8th Cir. 2011) (analyzing Indiana's and Missouri's Uniform Trade Secrets Act) (internal citations omitted).

At first blush, one might believe that Ellingson took some reasonable steps to keep its information secret, as the Agreement between Ellingson and Landmark contained a confidentiality provision, and Ellingson had Kippen enter into a nondisclosure agreement. But on closer inspection, these measures fall short. First, the confidentiality provision in the Agreement between Ellingson and Landmark does not identify any information or category of information that would qualify as a trade secret or confidential, as defined by the Agreement. Second (and importantly), the Agreement was expressly superseded by the Master Agreement, which contained no provisions as to confidentiality or nondisclosure.

Beyond the contracts, as to the drain tile plans and customer lists, there is nothing in the record that that information was labeled as confidential or that the customers signed nondisclosure or confidentiality agreements, or even knew about any purported confidentiality. This is particularly important on these facts, as Landmark and Kippen assert that they received the drain tile plans from the customers. See Smithfield Packaged Meats Sales Corp. v. Dietz & Watson, Inc., 452 F. Supp. 3d 843, 857 (S.D. Iowa 2020), modified in part, No. 120CV00005RGECFB, 2020 WL 5579177 (S.D. Iowa July 24, 2020), and modified, No. 120CV00005RGECFB, 2021 WL 2627454 (S.D. Iowa Apr. 23, 2021) (explaining, under the Iowa Uniform Trade Secrets Act, "courts have held a company that discloses its alleged trade secrets to customers without requiring them to sign confidentiality agreements may fail the reasonable efforts requirement.").

As to Kippen, the nondisclosure agreement presents a closer call. That agreement included customer lists, among other things, in defining confidential information. Even so, Ellingson has not demonstrated (at this point) it took reasonable efforts to keep the customer lists secret. There is no evidence that Landmark or Kippen acquired knowledge of these customers in a way that violated the nondisclosure agreement. And recall that under that agreement, customer lists are not confidential if they were known to Kippen before such information was disclosed by Ellingson. Doc. No. 25-3, p. 2. Kippen is a long-time resident of the Red River Valley in North Dakota, and he represented to Landmark that he had longtime contacts in the area, contacts that preexisted his relationship with Ellingson, that could become potential customers for Landmark. Ellingson points out that Kippen allegedly downloaded approximately 800 files "before leaving" Ellingson. See Doc. Nos. 25-17, 25-19. But there was testimony that those documents were actually downloaded over the course of several months and while Kippen was employed with Ellingson. The files themselves only contain incomplete file names, usernames, time stamps, along with some indecipherable code. There is little way to determine when and what was downloaded by Kippen, let alone assess whether there was

likely a violation of the nondisclosure agreement. Based on the limited information in the record at this point, there is little to show that Kippen's knowledge of the customers at issue (that he then shared with Ellingson) violated the nondisclosure agreement.

The current record cuts against Ellingson's position that it took reasonable steps to keep its alleged trade secrets secret. But even assuming the trade secret element was met, Ellingson has not sufficiently demonstrated a likelihood that any purported trade secrets were misappropriated. Doc. No. 21, pp. 13-14. To that end, the analysis in CPI Card Group is helpful. CPI Card Grp., Inc. v. Dwyer, 294 F. Supp. 3d 791, 810 (D. Minn. 2018). In that case, the court concluded an employer was not likely to succeed on the merits of its trade secret claim based on the misappropriation element, reasoning:

> But even if this Court concluded that CPI is likely to establish that these emails contained trade secrets, CPI still faces an uphill battle to demonstrate that Dwyer or MPS misappropriated them. . . . CPI has not presented any evidence showing that Dwyer forwarded these emails to MPS or otherwise personally used the information in a manner that is likely to constitute "misappropriation" under the applicable statutes. Absent evidence of use or disclosure, CPI would need to show "acquisition" by "improper means," . . . Notably, Dwyer's Confidentiality Agreement did not per se prohibit him from forwarding emails to his personal email account. And absent this express prohibition—or again evidence of use or disclosure—the Court is hard-pressed to conclude that Dwyer's behavior falls under the definition of "improper means." See id.

Id. at 810 (D. Minn. 2018). Here too, there is no evidence that Kippen forwarded any of the documents at issue to Landmark or that Kippen or Landmark used the information in a way that qualifies as misappropriation as defined by the DTSA. See 18 U.S.C. § 1839(5).

Absent use or disclosure, Ellingson must show acquisition by improper means. Ellingson focuses its attention on files (as discussed above) that Kippen allegedly downloaded before leaving his employment. Ellingson argues that if Landmark is using any purported trade secrets from files Kippen downloaded before he left, then Landmark is misappropriating Ellingson's trade secrets. But there is no indication in the record at this point that that is what happened. There is also nothing in

9

the record to contradict Landmark's position that the information at issue was "obtained from customers, through Kippen." Doc. No. 21, p. 13. And there is no evidence to determine whether such documents even contain trade secrets. As a result, Ellingson has not carried its burden on the misappropriation element.

In sum, as to the likelihood of success of its DTSA claim, Ellingson has not demonstrated a "fair chance of prevailing." Planned Parenthood Minn., 530 F.3d at 732. The current record on the DTSA claim, where there is much missing, raises doubts as to whether Ellingson took reasonable measure to keep its trade secrets secret and raises doubts as to whether Landmark and Kippen misappropriated any trade secrets. Because Ellingson did not demonstrate a likelihood of success on the merits of its claim, this Dataphase factor weighs against granting injunctive relief.

**B.      Remaining Dataphase Factors**

As Ellingson is unlikely to succeed on the merits, consideration of the remaining factors is unnecessary. See id. That said, the remaining factors (irreparable harm and the balance of equities and public interest) also weigh against a preliminary injunction. As to irreparable injury, the movant must generally establish there is a threat of irreparable harm if injunctive relief is not granted and that such harm is not compensable by an award of money damages. Doe v. LaDue, 514 F. Supp. 2d 1131, 1135 (D. Minn. 2007). A party seeking relief must demonstrate that the injury is of such imminence that there is a clear and present need for equitable relief to prevent irreparable harm. See id. at 921; Packard Elevator v. Interstate Commerce Comm'n, 782 F.2d 112, 115 (8th Cir. 1986). "'Failure to show irreparable harm is an independently sufficient ground upon which to deny a preliminary injunction.'" Prairie Field Servs., LLC, 497 F. Supp. 3d at 403.

On this record, Ellingson has not shown it is likely to suffer irreparable harm. The harm Ellingson identifies flows exclusively from the misappropriation of its purported trade secrets. True enough, there can be certain circumstances where misappropriation of a trade secret constitutes

irreparable harm. Wyeth v. Nat. Biologics, Inc., 395 F.3d 897, 902 (8th Cir. 2005). But this is not one of those cases, as Ellingson has not demonstrated a likelihood that any trade secrets were misappropriated. It follows then that there is no threat of irreparable harm.

To the extent that Ellingson claims it lost at least two customers to Landmark, and that Landmark is actively soliciting additional customers, there is still little threat of irreparable harm. Further, even if Ellingson eventually proves that Landmark and Kippen misappropriated trade secrets, that harm is compensable by money damages. See Wells Fargo Ins. Servs. USA, Inc. v. King, No. 15-CV-4378 (PJS/JJK), 2016 WL 299013, at *8 (D. Minn. Jan. 25, 2016) ("First, this case is about money. No historic building is going to be destroyed. No toxins are going to be released into the environment. No ship is going to leave port, never to return. King stole clients away from WFI, and the main harm that WFI suffered is lost profits on the business of those clients. By definition, lost profits are 'reparable' through money damages. Second, it appears that [plaintiff] should easily be able to identify the lost clients and quantify the lost profits."); Guy Carpenter & Co. v. John B. Collins Assocs., Inc., 179 F. App'x 982, 983 (8th Cir. 2006) ("We agree with the district court damages are an adequate remedy for any breach because clients who leave Carpenter can be identified and the damages resulting from the loss of those clients can be calculated." (internal citations omitted)). For those reasons, the second Dataphase factor also weighs against a preliminary injunction.[6]

Next, as to the third factor, the primary question is whether the "balance of equities so favors the movant that justice requires the court to intervene to preserve the status quo until the merits are determined." Dataphase, 640 F.2d at 113. To determine the harms that must be weighed, the Eighth Circuit has looked at the threat to each of the parties' rights that would result from granting or denying

---

[6] To the extent Ellingson relies on any contractual provisions as proof of (or agreement to) irreparable harm, that alone is insufficient to establish irreparable harm on these facts. See Moeschler v. Honkamp Krueger Fin. Servs., Inc., No. 21-CV-0416 (PJS/DTS), 2021 WL 4273481, at *13 (D. Minn. Sept. 21, 2021).

the injunction. Baker Elec. Co-op., Inc. v. Chaske, 28 F.3d 1466, 1473 (8th Cir. 1994). As already noted, Ellingson has failed to show a threat of irreparable harm. This is not to say there is no risk of harm, but any such harm is not the type of harm that warrants an injunction. On the other hand, the harm to Landmark of an order that excessively limits its business activities would be unnecessary and excessive. The third Dataphase factor weighs against an injunction.

And finally, as to the last Dataphase factor, the question is "whether the public interest would be served by granting the movant's motion for injunctive relief." Dataphase, 640 F.2d at 113. The Eighth Circuit Court of Appeals has held the public generally has an "interest in protecting contractual rights[.]" PCTV Gold, Inc., 508 F.3d at 1145. However, this is largely a dispute between private parties, so there is little interest to the public. As a result, the final Dataphase factor does not weigh in favor of either party.

### III.   CONCLUSION

After a careful review of the entire record, the Dataphase factors weigh against granting Ellingson a preliminary injunction, and Ellingson's motion (Doc. No. 18) is **DENIED**.

**IT IS SO ORDERED**.

Dated this 24th day of July, 2023.

*/s/ Peter D. Welte*
Peter D. Welte, Chief Judge
United States District Court